LOUIS KRAEMER and FERN E. KRAEMER, His Wife, Appellants, v. J. D. SHELLEY and ETHEL LEE SHELLEY, His Wife, and JOSEPHINE FITZGERALD.—No. 39997.—198 S. W. (2d) 679.

Court en Banc, December 9, 1946.

Rehearing Denied, January 13, 1947.

*G. L. Seegers* of *York & Seegers* for appellants.

816

*Geo. L. Vaughn* for respondents.

DOUGLAS, J.—This is a suit to enforce restrictions against the occupancy of property by negroes. From a judgment holding the restrictions invalid, plaintiffs appeal.

In 1911 some of the owners of the property fronting on both sides of Labadie Avenue in the double blocks between Taylor Avenue on the east and Cora Avenue on the west in the city of St. Louis signed the restrictive agreement set out below. Thirty out of a total of thirty-nine owners signed the agreement. Of the nine owners who did not sign, five were negroes. Negroes had occupied one parcel since 1882. The entire district comprised fifty-seven parcels divided into sixty-one lots. The thirty parties who signed the agreement owned forty-seven parcels or forty-eight lots having a total frontage of 1245 feet. The nine owners who failed to sign, including the five negroes, owned ten parcels or thirteen lots having a total frontage of 324 feet. The parcels owned by the negroes bore house numbers 4562, 4604, 4608, 4610 and 4614. The parcel involved in this case, which is covered by the agreement, is number 4600. It was purchased from white owners through a real estate firm, placed in the name of a white person who was a straw party, defendant Fitzgerald, and transferred to defendants Shelley and his wife, negroes, who are occupying the premises. Plaintiffs are the owners of a parcel in the district covered by the agreement. They seek an injunction against defendants Shelleys' occupancy and ask that title be divested out of them.

The agreement which was duly recorded in the office of the Recorder of Deeds is as follows: "This contract of restrictions made and entered into by the undersigned, the owners of the property fronting

on Labadie Avenue in Blocks 3710-B and 3711-B between Cora Avenue on the West and Taylor Avenue on the East, Witnesseth: That for and in consideration of one dollar and other valuable considerations paid by the undersigned, one to the other, the receipt of which is hereby acknowledged, each and ▪▪▪ every one of the undersigned persons hereby contract and agree with the other and for the benefit of all to place, and do place and make upon the Real Estate fronting on Labadie Avenue and running back to the alley on the North and South sides of Labadie Avenue between Taylor Avenue and Cora Avenue, a restriction, which is to run with the title of said property in favor of each and every one of the undersigned parties, and their assigns and legal representatives and successors as the owners of this property, which shall not be removed except by the consent of all of the property owners by some instrument or Deed, made and Executed and put of record, the said property is hereby restricted to the use and occupancy for the term of Fifty (50) years from this date, so that it shall be a condition all the time and whether recited and referred to or not in subsequent conveyances and shall attach to the land as a condition precedent to the sale of the same, that hereafter no part of said property or any portion thereof shall be, for said term of Fifty-years, occupied by any person not of the Caucasian race, it being intended hereby to restrict the use of said property for said period of time against the occupancy as owners or tenants of any portion of said property for resident or other purpose by people of the Negro or Mongolian Race. It is further contracted and agreed that upon a violation of this restriction either one or all of the parties to this agreement shall be permitted and authorized to bring suit or suits at law or in equity to enforce this restriction as to the use and occupancy of said property in any Court or Courts and to forfeit the title to any lot or portion of lot that may be used in violation of this Restriction for the benefit of each and every person that may now or hereafter, after the recording of this restriction, become the owner of any property on said street. To have and to hold each to the other their said property, subject, however, always and under all conditions to the terms of this restriction, each warranting to the other the compliance in every respect of the above restrictions. In Testimony whereof, the parties hereto have signed their name and seal this the 16th day of February, 1911.''

▪▪ The chancellor ruled it was the intention of the parties to the restrictive agreement, as shown by the terms of the agreement, that *all* the property within the district was to be covered by the restrictions. Therefore, since the owners of some of the parcels did not sign the agreement leaving some of the property not covered, the chancellor concluded he was bound by the ruling in Thornhill v. Herdt (Mo. App.), 130 S. W. (2d) 175, and held the agreement never became final and complete and was of no force.

The restrictive agreement in Thornhill v. Herdt designated as parties all of the owners of property within the proposed district, and the court there found it was essential to the intent of the agreement that all the property should be covered. That decision is applicable here only if we find that the agreement in this case shows the same intent to bind all or none.

"The primary consideration in the construction of a restrictive agreement—just as in the case of the construction of any other character of instrument—is to ascertain and give effect to the true intention of the contracting parties as the same may be gathered from the terms of the agreement itself when considered in the light of all the facts and circumstances attending its execution." Thornhill v. Herdt, supra.

Keeping this rule in mind we find it was not the intention of the parties that the agreement in this case should become effective only if every owner in the district would join as a party to it, so that the chancellor's conclusion to the contrary is erroneous. The agreement by its terms intended to cover only the property of those owners who signed it. Nowhere does the agreement designate all the owners as parties. It is limited to "the undersigned," who are then described as "the owners of the property fronting on Labadie Avenue." The expressed consideration passed between "the undersigned, one to the other." It was "each and every one of the undersigned persons" who subjected their parcels to the restriction. The restriction runs in favor of "the undersigned parties." Only "parties to this agreement" are authorized to ▮▮▮ bring suit to enforce the restriction. It would seem to us by the repeated use of the term "undersigned" and the reference to the "parties" to this agreement that the agreement was intended to cover only the parcels owned by those who became parties to it and to be effective as to them whether all signed or not. There is no mention in the agreement that its validity is conditioned on the joining of all or any particular number of the owners.

When we look to the surrounding circumstances our view of the intent of the agreement finds even stronger support. At the time the agreement was executed negroes owned five parcels in the district. Could they be expected to join in an agreement which would make their occupancy of their own property a ground for forfeiting their title? We say emphatically not. Although these five parcels were occupied by negroes when the agreement was made the district was then some distance from predominately negro sections. Obviously it could not have been the intention of the parties to prevent any negro occupancy at all because that already existed. It must have been their intention to prevent greatly increased occupancy by negroes. And their plan has succeeded. One of the five parcels then owned by negroes has passed into white hands. The remaining par-

822

cels, including the four which were occupied by white people who did not join the agreement, are still of white occupancy. The transfer of the parcel involved here to negroes seems to be the first attempt to violate the restriction.

The absence of nine parcels from the coverage of the agreement does not affect the agreement's validity since it was not the intention that every parcel should be covered before the agreement would become effective. Any number of owners, however small, may make a restrictive agreement which would be technically valid. The practical result of the failure of some of the owners in a district to join such an agreement does not necessarily affect the agreement's validity but affects its enforcement. If the purpose of a plan under which some property is restricted fails because other property in the district has not been likewise restricted, then equity will not enforce the agreement. The general purpose of a restrictive agreement must be achieved in order to justify its burden. Where the enforcement would impose a hardship and bring no benefit then the consequences of such enforcement would be inequitable and relief will be denied. The latter situation prevailed in Pickel v. McCawley, 329 Mo. 166, 44 S. W. (2d) 857 and the court refused to enforce the agreement.

In this case, as we have pointed out, the purpose of the plan is being accomplished. Also, the chancellor has found there is no change in the conditions in the district which would warrant withholding equitable relief, and that the parties are not guilty of laches. There has been no waiver or abandonment. Accordingly, there is no reason why the enforcement of the restriction would be inequitable. The agreement is valid and the restriction should be enforced. Plaintiffs are entitled to the equitable relief they are seeking.

In a recent case we considered the same question in connection with the rule announced by Thornhill v. Herdt, supra, and held the restrictive agreement was enforceable even though the restriction did not cover all of the parcels in the district because of the failure of some of the owners to sign the agreement. Swain v. Maxwell, 355 Mo. 448, 196 S. W. (2d) 780. Our views here are the same as in that case and confirm its rulings.

Agreements restricting property from being transferred to or occupied by negroes have been consistently upheld by the courts of this state as one which the parties have the right to make and which is not contrary to public policy. Swain v. Maxwell, supra; Porter v. Pryor (Mo.), 164 S. W. (2d) 353; Koehler v. Rowland, 275 Mo. 573, 205 S. W. 217, 9 A. L. R. 107; Thornhill v. Herdt, supra; Porter v. Johnson, 232 Mo. App. 1150, 115 S. W. (2d) 529. The new provision in the Bill of Rights in the Constitution of 1945, Art. I, Sec. 2, "that all persons are created equal and are entitled to equal rights and opportunity under the law" not only sustains these decisions but even strengthens them. Other jurisdictions also

uphold such agreements. See 14 Am. Jur. Covenants etc., sec. 208, and Anno. 162 A. L. R. 180 and prior annotations.

The restriction does not contravene the guaranties of civil rights of the Constitution of the United States. Corrigan v. Buckley, 271 U. S. 323, 46 S. Ct. 521, 70 L. Ed. 969. A recent case reviewing the Corrigan case and again upholding such an agreement is Mays v. Burgess, 147 F. (2d) 869, 172 A. L. R. 168, decided by the United States Court of Appeals for the District of Columbia. · That case considered the question whether a restrictive agreement violated the Fifth and Fourteenth Amendments and Section 1 of the Thirteenth Amendment of the Constitution of the United States and the statutes enacted thereunder, particularly 8 U. S. C. A., secs. 41, 2, and held it did not. That case followed the ruling in Corrigan v. Buckley that neither the Thirteenth nor Fourteenth Amendments prohibited private individuals from entering into contracts respecting the control and disposition of their own property. While Gandolfo v. Hartman (1892), 49 F. 181 takes a contrary view, we find it has been criticized and not followed, and so far as it relates to the question here has been overruled in effect by Corrigan v. Buckley. Nor can it be claimed that the enforcement of such a restriction by court process amounts to action by the state itself in violation of the Fourteenth Amendment, which relates to a state action exclusively. To sustain such a claim would be to deny the parties to such an agreement one of the fundamental privileges of citizenship, access to the courts. This would violate both the State and Federal Constitutions. Art. I, Sec. 14 Constitution 1945, Art. IV, Sec. 2, Constitution United States.

The filing of the agreement for record with the recorder of deeds gave the defendants at least constructive notice of the restriction which is sufficient. Under Section 3426 and 3427 R. S. 1939 Mo. R. S. A. every instrument in writing which affects real estate imparts notice by being recorded. The sufficiency of notice of restrictions was considered in King v. St. Louis Union Trust Co., 226 Mo. 351, 126 S. W. 415. ''An instrument containing a restrictive agreement entitled to record and which is recorded is notice, although it does not contain a conveyance of reality.'' 18 Am. Jur. Covenants, etc., sec. 331. Defendants are in no position to claim lack of notice.

The question whether such an agreement violates the rule against perpetuities was decided in the negative in Koehler v. Rowland, 275 Mo. 573, 205 S. W. 217.

The chancellor found the negro population in St. Louis has greatly increased in recent years, and now numbers in excess of 100,000; and that some of the sections in which negroes live are overcrowded, which is detrimental to their moral and physical well being.

824

Such living conditions bring deep concern to everyone, and present a grave and acute problem to the entire community. Their correction should strikingly challenge both governmental and private leadership. It is tragic that such conditions seem to have worsened although much has been written and said on the subject from coast to coast. See Mays v. Burgess, supra, and Fairchild v. Raines, 24 Cal. (2d) 818, 151 Pac. (2d) 260. But their correction is beyond the authority of the courts generally, and in particular in a case involving the determination of contractual rights between parties to a law suit. If their correction is sought in the field of government, the appeal must be addressed to its branches other than the judicial.

The judgment dismissing the petition should be reversed and the cause remanded with directions to the chancellor to enter a decree upholding the restrictions and granting plaintiffs the relief prayed for, and such other relief as the court may deem just and proper. Furthermore, the chancellor may retain jurisdiction of the case for the settlement of any claims between the defendants and others over the purchase of the property which may arise because of the enforcement of the restriction.

Such is our order. All concur except *Gantt, J.*, not sitting.