Jack W. MINTON et al., Plaintiffs-Appellants,

v.

Daniel B. LICHTENSTEIN and Edward W. Krite as the Trustee for Frances A. Dockery, Defendants,

Daniel B. Lichtenstein, Defendant-Respondent.

No. 34389.

Missouri Court of Appeals, St. Louis District.

Oct. 3, 1972.

Motion for Rehearing or to Transfer to Supreme Court Denied Nov. 10, 1972.

Jack F. Allen, Clayton, for plaintiffs-appellants.

George F. Mehan, Jr., Clayton, for defendant-respondent.

BRADY, Chief Judge.

This is a suit to enforce by means of a mandatory injunction a fence restriction in a subdivision indenture. Finding that it was waived, relinquished, and abandoned, the trial court refused to enforce the covenant and plaintiffs, trustees of Forest Green Estates, appealed.

Sub-paragraph 10(h) of the main indenture governing Forest Green Estates prohibits the erection of fences unless the trustees first give their written approval: "No fence, except hedge fences, or other enclosure, and no retaining walls shall be erected upon any lot within said subdivision unless the erection thereof is first approved in writing by the Trustees." The main indenture was executed and recorded on June 16, 1961. On July 15, 1966 the Board of Trustees adopted a resolution which stated that the main emphasis and intent of the indentures was that there be no fences other than hedge fences, but that ornamental fences would be approved to provide adequate protection around swimming pools. The special provision regarding swimming pool fences further stated that other fences would not be considered for approval without a written statement that shrubs will be planted to substantially hide the fence.

Defendant Daniel Lichtenstein purchased Lot 9 of Forest Green Estates on July 26, 1966. Mr. Lichtenstein received a title insurance policy and title certificate, both of which contained references to the indenture restrictions. In February of 1967 he erected an iron fence on his property without obtaining written approval from the trustees. The ornamental fence, 168 feet long and 48 inches high, was designed to confine defendant's dog and provide a place for his daughter to play.

In January of 1967 the residents of Forest Green Estates elected new trustees. One of the new trustees testified that they were elected on an anti-fence mandate.

Mr. Lichtenstein testified that on the night of the election Mr. Gerstner, the newly elected President of the Board, indicated orally that he would probably have no objection to the fence, although even Mr. Lichtenstein admits he did not consider this final approval. Mr. Gerstner denies discussing the fence with Mr. Lichtenstein. Mr. Lichtenstein testified further that he did not speak to any of the other trustees on the night of the election although two trustees testified that they had previously refused Lichtenstein's oral requests for permission to build the fence. In April of that year the new trustees sent a letter to all lot owners calling attention to the fence restriction and warning that suit would be filed seeking removal of unapproved fences. A specific letter was sent to defendant Lichtenstein requesting that he remove his fence. Lichtenstein refused to comply and suit was filed in July of 1967.

Other fences existed in Forest Green Estates at the time the present suit was filed: a chain link perimeter fence on the Tobias property (approved by the developer trustees), a stockade swimming pool fence on the Christy property (approved by the developer trustees), and several ornamental swimming pool fences (all of which have received trustee approval). The Tobias fence produced many complaints from the members of the subdivision and a fair interpretation of the evidence is that its approval led to the resignation of some who were then trustees. Subsequent to the filing of this suit the trustees authorized chain link fences on the O'Neill and Murphy properties which bordered a new subdivision and had become a by-pass between another subdivision and Forest Green Estates. People were walking and riding bicycles through the O'Neill's and Murphy's property. In 1968 a three-foot ornamental fence was constructed on the Planting property. The owner testified that this fence was part of a plan to construct a screened porch and that finalized plans would be submitted to the trustees for their

approval. It appears that the trustees were unaware of this fence since there is no evidence indicating their knowledge of its existence, and it was not included in a list of fences in Forest Green Estates compiled after a survey by one of the trustees in 1969. There were also short stockade fences on the Presnell and Ruthsatz properties at the time of the trial but the record does not reveal when they were constructed. There is no indication that the trustees were aware of the extremely short fence on the Presnell property, and they had objected to the Ruthsatz fence but postponed action pending the outcome of this suit. There was an additional stockade fence removed from the McIntyre property following an action brought by the trustees in September of 1967. On July 2, 1970 the trustees refused a written request from four members of the subdivision to construct a fence along the back lines of their properties bordering DesPeres Avenue.

In a case of this kind we hear the case de novo, and giving due deference to the trial court's findings in matters involving the credibility of witnesses, reach our own conclusion as to both facts and law. Lake Development Enterprises, Inc. v. Kojetinsky, Mo.App., 410 S.W.2d 361.

Although the law favors the free and untrammeled use of real property, restrictions thereon are not to be disregarded. Gibbs v. Cass, Mo.App., 431 S.W.2d 662; Proetz v. Central Dist. of Christian & Missionary Alliance, Mo.App., 191 S.W. 2d 273. Further, our power and authority, through a mandatory injunction, to compel the undoing of a thing already done in violation of restrictive covenants affecting real estate is well established. Swain v. Maxwell, 355 Mo. 448, 196 S.W.2d 780; Compton Hill Imp. Co. v. Strauch, 162 Mo.App. 76, 141 S.W. 1159.

The pivotal issue in this case is whether the trustees have relinquished,

waived, and abandoned the restrictive covenant. There are no hard and fast rules as to what constitutes waiver; each case must be decided on its own facts. Gibbs v. Cass, *supra*; Eichelsbach v. Harding, Mo. App., 309 S.W.2d 681. In *Eichelsbach* this court stated that violations of restrictions which apply to an entire subdivision and are for the benefit of all property owners in a restricted area must be so general as to indicate an intention to abandon the plan or scheme on the part of the residents of the subdivision. In that case violations on 29 of the 160 lots in the subdivision were not sufficient to constitute waiver.

In the instant case the fences on the Tobias and Christy properties were approved by the developer trustees. Although their approval may have been an abuse of discretion, such action does not render the covenants forever unenforceable. Indeed, appellant admits that while approval of the Tobias fence was a mistake, it does not forever relinquish the right of other trustees to enforce the fence restriction.

The only unapproved fences which were not objected to are the Planting and Presnell fences. Both of these are relatively inconspicuous which may account for the lack of complaints. Moreover, the Planting fence is a part of a plan to enclose a backyard patio which is to be submitted for trustee approval. Nevertheless, under the standards stated in *Eichelsbach*, we do not feel these facts indicate an intention on the part of the residents of Forest Green Estates to abandon or relinquish the covenants. On the contrary, the furor over actions of the former trustees, testimony that the new trustees were elected on an anti-fence mandate, suits brought against McIntyre and Lichtenstein, the letter sent by the attorney for the trustees in 1967, all indicate an intention on the part of both residents and trustees to enforce and live by the restrictive covenants.

Nor do we find a pattern of arbitrary and discriminatory enforcement. Although the resolution of 1966 states that the main intent of the indentures is to prohibit all fences other than hedges, it does not purport to deny the trustees the discretionary power to approve fencing granted them in the main indenture. The need for swimming pool fences is self-evident. Approval of the O'Neill and Murphy perimeter fences and refusal of the four family requests in 1970 appear within the trustees' discretionary powers and we do not deem such action arbitrary or capricious. All that is necessary is that there be a reasonable basis for granting approval in one instance and denying it in another. See Lake Development Enterprises, Inc. v. Kojetinsky, *supra*. The record does not indicate the reason the four family request was denied, but absent affirmative evidence of arbitrary action we cannot assume the trustees acted without reason.

Respondent Lichtenstein urges that since he received oral approval from the President of the Trustees, the erection of the fence is a mere technical violation of the requirement in the indenture that written permission be obtained from the trustees. The evidence is in direct contradiction on whether such oral approval was given, and even Mr. Lichtenstein admitted that he did not consider his conversation to constitute final approval. In any event, respondent's argument carries little force. Assuming arguendo that Mr. Gerstner did orally approve the fence (which we do not so find), he had no power to do so. The President of the Trustees has no power on his own to approve fences either orally or in writing—approval must be "in writing by the trustees."

Finding no abandonment, relinquishment, or arbitrary enforcement which would prohibit granting the relief sought, the judgment of the trial court is reversed and the mandatory injunction is granted.

WEIER and CLEMENS, JJ., concur.